## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| HAYES LEMMERZ INTERNATIONAL | ) | No. 01-11490 (MFW) |
| INC., et al. | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| HLI CREDITOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Adv. Proceeding No. 03-58493 (PBL) |
| | ) | |
| METAL TECHNOLOGIES, INC., d/b/a | ) | |
| METAL TECHNOLOGIES | ) | |
| WOODSTOCK, LTD. | ) | |
| Defendant. | ) | |
| | ) | |

### REPLY BRIEF IN SUPPORT OF
### DEFENDANT'S MOTION FOR
### CORRECTION OF CLERICAL MISTAKE
### OR TO ALTER OR AMEND JUDGMENT

Defendant Metal Technologies Woodstock Corporation f/k/a Metal Technologies Woodstock, Ltd., asks this Court to enter Judgment against the entity the parties stipulated was the proper defendant, consistent with the uncontroverted evidence at trial. Plaintiff HLI Creditor Trust opposes Woodstock's motion. The thrust of the Plaintiff's argument is that it stands a better chance of collecting the Judgment if it is entered against the wrong entity.

### A.    REVIEW OF FACTUAL ISSUES

The Plaintiff's opposition to the pending motion is baseless. It has no basis in fact, and actually runs counter to stipulated facts.

1.    **The Truth Regarding Defendant Woodstock**

The uncontroverted fact is that the creditor in this adversary proceeding is Metal Technologies Woodstock Corporation f/k/a Metal Technologies Woodstock, Ltd. (Joint Pretrial Memorandum, Section V, Paragraph G, p. 6. (Adv. DI#100)) This truth is revealed in the exhibits admitted into evidence by stipulation of the parties. (Joint Pretrial Memorandum, Section II, Paragraph A, pp. 2-4. (Adv. DI#100)) Exhibit S10 is a letter from Woodstock's General Manager announcing the company's purchase of the Eureka foundry. It is on stationery identifying Woodstock as "a subsidiary of Metal Technologies, Inc." The invoices introduced into evidence, Exhibits S14-15, do the same. Every payment at issue was made to "Metal Technologies-Woodstock." *See* Exhibits S21-30.

The testimonial evidence explaining the relationship between Woodstock and its parent corporation went unrebutted. Greg M. Riker and Frank A. Staudinger both testified about that relationship, and they confirmed that Woodstock is the entity that did business with the debtor.

Nothing about these exhibits and witness testimony was ever challenged. The Plaintiff knows full well that the debtor did business with Defendant Woodstock. It has proffered nothing to the contrary, and it rightly acknowledged the truth in the Joint Pretrial Memorandum knowing that the stipulation would govern the conduct of the trial and supersede all prior pleadings.[1] Its opposition to the present motion is entirely lacking in merit.

---

[1] On this point, the Plaintiff cannot rely on discovery responses. The Joint Pretrial Memorandum takes precedence over discovery responses because ambiguities that may persist through the discovery process are to be clarified before trial begins. The undisputed fact is that Defendant Woodstock is a subsidiary of Metal Technologies, Inc. (twice removed). The misnomer in the pleadings was clarified when it became evident that a trial was going to take place. The Plaintiff does not dispute the accuracy of the Joint Pretrial Memorandum, which it could not do in any event because it is entirely accurate; therefore, that stipulation should govern the trial and supersede all prior pleadings.

2.    **The Truth Regarding Notice to Plaintiff**

The Plaintiff has no basis to question the fact that the creditor in this adversary proceeding is Defendant Woodstock. Therefore, as a matter of undisputed fact, Defendant Woodstock is the entity against whom the Judgment should enter. Metal Technologies, Inc., is not the proper defendant.

Lacking facts to support its opposition, the Plaintiff alleges surprise. It contends that "the Defendant has never raised any issue concerning the identification of the Defendant in this matter." HLI Creditor Trust's Response in Opposition, page 1 (Adv. DI#54).[2] It further asserts that, "until two weeks prior to the trial in this matter, the Defendant [presumably meaning Metal Technologies, Inc.] had never contended that it was an improper party . . . ." These representations are so blatantly false that they cannot be innocent mistakes.

First, the Joint Pretrial Memorandum was submitted to this Court fully two months before trial. Second, the distinction between Defendant Woodstock and Metal Technologies, Inc., was noted in the summary judgment briefing. The brief filed in support of the Motion for Summary Judgment stated as follows:

> The Plaintiff commenced this adversary proceeding against Defendants to recover alleged preferences paid by Hayes Lemmerz International, Inc., and/or its subsidiaries (collectively the "Debtor") to Woodstock. MTI is a Delaware corporation with its principal office in Auburn, Indiana. Woodstock is its wholly-owned subsidiary and has its principal office in Woodstock, Ontario, Canada. Woodstock was previously known as Metal Technologies Woodstock, Ltd., and it is the entity that actually did business with the Debtor. All payments at issue in this adversary proceeding were made by the Debtor to Woodstock, not MTI.

---

[2] The Plaintiff is so resolute on misrepresenting the heretofore uncontested facts that it renames Defendant Woodstock's motion.

Brief in Support of Defendants' Motion for Summary Judgment, p. 1 (Adv. DI#43). Third, early on, Defendant Woodstock submitted its Rule 7026/Rule 26(a) Disclosures (Adv. DI#16) in the name of "Metal Technologies Woodstock, Ltd., (the 'Defendant')." Fourth, the Answer (Adv. DI#5) in this case was filed on behalf of "Metal Technologies, Inc. ('MTI') and Metal Technologies Woodstock Corporation f/k/a Metal Technologies Woodstock, Ltd., ('Woodstock')." The substantive allegations were uniformly denied with respect to MTI and answered with more nuance by Defendant Woodstock.

The Plaintiff knew of the distinction between the two entities--along with the fact that only Defendant Woodstock was the recipient of alleged preferential payments--independently of formal submissions to this Court. On April 8, 2004, nearly two years ago, defense counsel responded to a settlement proposal that had been submitted by the Plaintiff's counsel. A copy of the letter, which was addressed to the Plaintiff's lead trial counsel, is attached as Exhibit 1. The entirety of the second paragraph provided as follows:

> Before outlining Woodstock's defenses to the alleged preferences, there are a couple of issues to address. First, Woodstock is not a "d/b/a" of Metal Technologies, Inc. ("MTI"). Woodstock and MTI are two completely separate legal entities. Woodstock sold the goods to Hayes Lemmerz subject to the preference attack and received the payments for such goods from Hayes Lemmerz. MTI did not sell any goods to Hayes Lemmerz during the preference period. Nor did it receive any payments from Hayes Lemmerz during the preference period. As such, MTI is not a proper defendant in this adversary proceeding, and we ask that the Trust dismiss MTI as a defendant.

The assertion that Woodstock's involvement and Metal Technologies' lack of involvement comes as a surprise to the Plaintiff is a gross misrepresentation. The Plaintiff knows better than to debate Defendant Woodstock's status as the proper defendant in this case.

4

B.    **REVIEW OF LEGAL ISSUES**

The Plaintiff erroneously states that Defendant Woodstock is asserting a *judicial error* instead of a *clerical error*. The Judgment (Adv. DI#124) in this case does not define the proper defendant, and the Opinion (Adv. DI#123) rendered in conjunction with the Judgment simply contains a misnomer, a reference to the identification of the defendant(s) as set forth in the caption, not the formal designation set forth by the parties in their Joint Pretrial Memorandum. In any event, the cases cited by the Plaintiff are inapposite. The first case, *In Re Immenhausen Corp.*, 166 B.R. 449, 452 (Bankr. M.D. Fla. 1994), involved an effort to reverse a substantive ruling. The Plaintiff's reliance on the second case, *In re Janis M. McReynolds*, 166 B.R. 452 (Bankr. M.D. Fla. 1994), is a complete mystery. That case involved a discovery dispute, not any request for post-judgment relief.

Further, the Plaintiff ignores the fact that Woodstock's motion is brought pursuant to Rule 9023 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 59(e) of the Federal Rules of Civil Procedure. Defendant Woodstock respectfully submits that the misnomer is the result of a clerical mistake, but either way this Court has the authority to make its Judgment reflect the truth. Such authority is inherent in a court of law, and it is specifically granted through the combination of Rules 59 and 60 of the Federal Rules of Civil Procedure.

The unfounded nature of the Plaintiff's opposition to the pending motion is evident from the fact that the parties, in their Joint Pretrial Memorandum, accomplished what would have taken place if Metal Technologies, Inc., had filed a dispositive motion arguing that the wrong entity had been sued. Assuming Woodstock was considered not to be a party, and in light of the facts that were presented at trial, the immediate response from the Plaintiff would have been to request an opportunity to amend its complaint to fix the misnomer. This litigation would not

have come to an end. Instead, it would have proceeded to trial against Defendant Woodstock, just as the parties agreed through their Joint Pretrial Memorandum.

## C.    **CONCLUSION**

The Plaintiff once again resorts to hyperbole and *ad hominem* attacks. Defendant Woodstock is not engaging in a shell game. It seeks a Judgment that reflects the truth, specifically the truth that has been known by the Plaintiff all along. The Plaintiff is the one that wishes to take legal action which ignores the truth. Therefore, for the reasons set forth in this brief and its original brief, Defendant Woodstock respectfully requests that the Judgment in this case be corrected to reflect that the proper defendant is Metal Technologies Woodstock Corporation f/k/a Metal Technologies Woodstock, Ltd.

Respectfully submitted:

**ATTORNEYS FOR DEFENDANT**

**GREENBERG TRAURIG, LLP**

By:_____
　　　Dennis A. Meloro (No. 4435)
　　　The Nemours Building
　　　1007 North Orange Street, Suite 1200
　　　Wilmington, Delaware  19801
　　　Telephone: (302) 661-7000
　　　Facsimile: (302) 661-7360

and

**VARNUM, RIDDERING, SCHMIDT &
HOWLETT LLP**
　　　Michael S. McElwee (P36088)
　　　333 Bridge Street, N.W., Suite 1700
　　　Grand Rapids, MI  49504
　　　Telephone: (616) 336-6000
　　　Facsimile: (616) 336-7000

6



BRIDGEWATER PLACE • POST OFFICE BOX 352
GRAND RAPIDS, MICHIGAN 49501-0352

TELEPHONE 616 / 336-6000 • FAX 616 / 336-7000 • WWW.VARNUMLAW.COM

MARY KAY SHAVER

DIRECT DIAL 616/336-6755
E-MAIL mkshaver@varnumlaw.com

April 8, 2004

**VIA FEDERAL EXPRESS**

Mr. John Delnero
Bell, Boyd & Lloyd, LLC
Three First National Plaza
70 West Madison Street, Suite 1700
Chicago, Illinois 60602

> **Re:**   ***HLI Creditor Trust v Metal Technologies, Inc. d/b/a Metal Technologies Woodstock, Ltd.***, **Adversary Proceeding No. 03-58493**

Dear John:

We are in receipt of the settlement letter from HLI Creditor Trust (the "Trust") dated March 11, 2004 in which the Trust offered to settle the above-referenced adversary proceeding for $776,000.   For the reasons set forth below Metal Technologies Woodstock, Ltd., ("Woodstock ") declines the Trust's offer.

Before outlining Woodstock's defenses to the alleged preferences, there are a couple of issues to address.   First, Woodstock is not a "d/b/a" of Metal Technologies, Inc. ("MTI"). Woodstock and MTI are two completely separate legal entities.   Woodstock sold the goods to Hayes Lemmerz subject to the preference attack and received the payments for such goods from Hayes Lemmerz.   MTI did not sell any goods to Hayes Lemmerz during the preference period. Nor did it receive any payments from Hayes Lemmerz during the preference period.   As such, MTI is not a proper defendant in this adversary proceeding, and we ask that the Trust dismiss MTI as a defendant.

Second, Woodstock's records and the Trust's records are not in harmony.   Exhibit A to the Complaint ("Exhibit A") identifies several wire transfers to Woodstock during the preference period, but does not identify how these wire transfers were applied.   Woodstock acknowledges receipt of these wire transfers, and upon receipt, applied them to future invoices.   Schedule 1 is a listing of all of the alleged preferences (except one which is addressed below) and Woodstock's application of these payments.

# VARNUM
### RIDDERING SCHMIDT HOWLETT LLP
**ATTORNEYS AT LAW**

Mr. John Delnero
April 8, 2004
Page 2

With these preliminary issues addressed, the following sets forth Woodstock's defenses to the alleged preferences:

## I. PAYMENTS PRIOR TO THE PREFERENCE PERIOD

Exhibit A identifies a payment in the amount of $35,985.50 (Check No. 9181) as clearing on September 5, 2001. The Debtor filed bankruptcy on December 5, 2001. Thus, the 90-day preference period began on September 6, 2001. As a result, this payment of $35,985.50 on September 5, 2001 is prior to the 90-day preference period and is not subject to a preference attack.

## II. PAYMENTS NOT RECEIVED

Exhibit A identifies a payment in the amount of $158,812.50 on December 4, 2001 (Check No. 10171). Woodstock did not receive this payment. The invoices which the Trust alleges were paid by this payment were (a) not paid at all or (b) paid by wire transfers. First, two invoices (Nos. 100313 and 100321) each in the amount of $11,894 were never paid. Woodstock included both of these invoices in its proof of claim because they were never paid. Second, the remaining invoices were paid by wire transfers (Ref. Nos. 6225, 12067, 2550, 4433 and 4497). Please refer to Schedule 1 for the specific application of these wire transfers. Since this payment of $158,812.50 on December 4, 2001 does not exist, the total alleged preferences should be reduced accordingly.

## III. PAYMENT IN ADVANCE

Exhibit A identifies several wire transfers (Ref. Nos. 6225, 12067, 2550, 4433, 4497, 14653 and 12362) from Hayes Lemmerz to Woodstock during the preference period. These wire transfers were payments in advance for certain invoices, and thus, were not made on account of antecedent debt. Beginning on or about November 12, 2001, Woodstock required Hayes Lemmerz to pay for new orders in advance. Schedule 2 identifies the payments received in advance and the invoices to which Woodstock applied the payments. Schedule 2 demonstrates that the wire transfers totaling $182,600 were not made on account of antecedent debt, and therefore, do not constitute preferences.

## IV. SUBSEQUENT NEW VALUE DEFENSE

Woodstock has a valid subsequent new value defense pursuant to 11 U.S.C. § 547(c)(4) in the amount of $154,622. After receiving some of the alleged preferences from Hayes Lemmerz, Woodstock shipped various products for which it never received payment. Schedule 3 identifies the payments received within the preferential period and the subsequent new value provided by Woodstock for which it was never paid. Schedule 3 clearly demonstrates that Woodstock has a valid subsequent new value defense to the alleged preferences in the amount of $154,622.

VARNUM
RIDDERING SCHMIDT HOWLETT LLP
ATTORNEYS AT LAW

Mr. John Delnero
April 8, 2004
Page 3

## V. <u>ORDINARY COURSE OF BUSINESS DEFENSE</u>

Woodstock has a valid ordinary course of business defense pursuant to 11 U.S.C. § 547(c)(2) for all of the remaining alleged preferences.

*A.    Facts*

Woodstock provides automotive castings to Hayes Lemmerz. This relationship began in June 2001 when Woodstock purchased assets from Eureka Foundry ("Eureka"). Prior to Woodstock purchasing the assets of Eureka, Hayes Lemmerz typically paid Eureka within 90 days of the invoice date. This practice continued after Woodstock purchased the assets of Eureka. It is important to note that, in the automotive industry, suppliers have very little leverage in demanding payment in a specified time. The customer has enormous leverage over its suppliers because of the heavy capital requirements in the production of auto parts and the limited number of customers. A supplier is unable to take aggressive collection action or to specify more favorable payment terms, because the customer can find another source or supply, thus, leaving the supplier without a major piece of business to fill its factory. As a result, it is routine for automotive parts customers to pay beyond terms without incurring any penalty or objection from the supplier.

Up until November 12, 2001, when Woodstock placed Hayes Lemmerz in pre-paid status, business was usual. Woodstock did not take any collection efforts against Hayes Lemmerz to pay outstanding invoices. Nor did Woodstock penalize Hayes Lemmerz for late payments. Woodstock simply accepted payment from Hayes Lemmerz as it was received.

Even after Woodstock placed Hayes Lemmerz on pre-paid status, it did not take any collection efforts against Hayes Lemmerz to pay outstanding invoices. This can be evidenced by the fact that Woodstock had to file a proof of claim for unpaid invoices issued prior to Woodstock placing Hayes Lemmerz on pre-paid status. Clearly, if Woodstock had been intending to pressure Hayes Lemmerz, it could have easily refused to deliver goods to Hayes Lemmerz until *all* outstanding invoices were paid in full. The fact of the matter is that Woodstock placed Hayes Lemmerz on pre-paid status for *future* orders and simply accepted payments from Hayes Lemmerz for outstanding invoices in the ordinary course (i.e. within 90 days after the invoice date).

**VARNUM**
RIDDERING SCHMIDT HOWLETT LLP
ATTORNEYS AT LAW

Mr. John Delnero
April 8, 2004
Page 4


B.      *Applicable Law*

Section 547(c)(2) provides in relevant part:

The trustee may <u>not</u> avoid under this section a transfer ... (2) to the extent that such transfer was –

(A)     in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B)     made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C)     made according to ordinary business terms.

The legislative history of § 547(c)(2) indicates that this exception to preferential avoidance was enacted to accommodate routine payment arrangements that are not "unusual" and do not interfere with the underlying purpose of the preference statute. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 Code Cong. & Admin. News 5787,5874; *see also In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 219-20 (3rd. Cir. 1994); *J.P. Fyfe, Inc. of Florida v. Bradco Supply Company*, 891 F.2d 66, 70 (3rd Cir. 1989). The preference avoidance power is limited to situations where unusual payments have occurred and does not apply to every payment that occurs within the 90-day preference period.

Section 547(c)(2)(A) requires that the debt underlying the alleged preferences must have arisen in the ordinary course of business between the debtor and the creditor. *See J.P. Fyfe*, 801 F.2d at 69; *In re APS Holding Corp.*, 282 B.R. 795, 802 (Brktcy. D. Del. 2002); *In re CM Holdings, Inc.*, 264 B.R. 141, 153 (Brktcy. D. Del. 2000).

Section 547(c)(2)(B) is a subjective element, which requires an evaluation of whether the alleged payments were typical as between the parties. *See APS Holding Corp.*, 282 B.R. at 802; *CM Holdings, Inc.*, 264 B.R. at 153. The typical focus of this factual analysis is whether the business dealings between the parties during the preference period are similar with the business dealings between the parties prior to the preference period. *In re Cherrydale Farms, Inc.*, 2001 W.L. 1820323 (Bankr. Del. 2001). The word "similar", however, does not mean identical. In *Cherrydale,* the Court held:

The inquiry under the subjective test is whether the transfer was ordinary as between Brown and Cherrydale. To qualify, the "transfers" must be consistent with Brown and Cherrydale's prior business dealings. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 96 Bankr. 474, 476-77, Dist. N.J., *aff'd* 891 F.2d 66 (3rd Cir. 1989). It need not, however, possess a rigid similarity to each past transaction. *Id.*

*Cherrydale*, at 3 (emphasis added); *see also In re Color Tile*, 239 B.R. 872, 875 (Bkrtcy. D. Del. 1999) (finding that the parties' terms were not altered during the preference period and that the

**VARNUM**
RIDDERING SCHMIDT HOWLETT LLP
━━ ATTORNEYS AT LAW ━━

Mr. John Delnero
April 8, 2004
Page 5

creditor did not exert any economic pressure on the debtor). Importantly, "lateness of payment does not preclude a finding that the payment was not made in the ordinary course of business, and indeed a pattern of lateness can establish an ordinary course between the parties." *In re Big Wheel Holding Co., Inc.*, 223 B.R. 669 (Bkrtcy. D. Del. 1998).

Section 547(c)(2)(C) is an objective element, which only requires the creditor to prove that the terms to which the parties agreed were not "so idiosyncratic as to fall outside" the broad range of terms generally observed by "firms similar in some way" to the creditor:

> We believe that the Court of Appeals for the Seventh Circuit delivered the best rendering of the text of §547(c)(2)(C) when it held that "ordinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (emphasis in original). We will embellish the Seventh Circuit test, however, with a rule that subsection C countenances a greater departure from that range of terms the longer the pre-insolvency relationship between the debtor and creditor was solidified.

*Molded Acoustical*, 18 F.3d at 220; *see also Big Wheel*, 223 B.R. at 674. Thus, in *Molded Acoustical*, the Third Circuit adopted a sliding scale rule when analyzing whether payments satisfy § 547(c)(2)(C). The more established the relationship between the debtor and creditor, the more the terms between those parties can diverge from the industry standards and still satisfy § 547(c)(2)(C). *See id.* The less established the relationship between the debtor and creditor, the more the industry standard becomes relevant. *See id; see also Color Tile*, 239 B.R. at 875-76 (holding that the parties had established a baseline of ordinary course in the pre-preference period and, therefore, the industry standard was not as relevant in proving § 547(c)(2)(C)).

C.    *Application to Woodstock*

Applying the law discussed above, Woodstock only needs to demonstrate the following in order to prevail in its ordinary course of business defense: (i) Hayes Lemmerz incurred the underlying debt to Woodstock in the ordinary course of business; (ii) the transfers during the preference period were consistent with past dealings between Woodstock and Hayes Lemmerz and (iii) the terms to which Woodstock and Hayes Lemmerz agreed were not "so idiosyncratic as to fall outside" the broad range of terms generally observed in the automotive industry.

The fact Hayes Lemmerz incurred the underlying debt to Woodstock in the ordinary course of its business cannot be disputed. Hayes Lemmerz debt to Woodstock was clearly for the purchase of automotive castings used in Hayes Lemmerz' ordinary course as a machining company.



Mr. John Delnero
April 8, 2004
Page 6

Similarly, the fact that the transfers during the preference period were consistent with past dealings between Woodstock and Hayes Lemmerz is indisputable. <u>Schedule 4</u> is a list of all business transactions (other than those involving pre-payments) between Woodstock (and its predecessor, Eureka) and Hayes Lemmerz from October 15, 1999 through December 5, 2001, the date Hayes Lemmerz filed bankruptcy. <u>Schedule 4</u> clearly demonstrates that, for the two years preceding the preference period, Hayes Lemmerz paid Woodstock (or Eureka) on average within 78 days of the invoice being issued. Some invoices were paid earlier and some were paid later. Thus, this was the established courses of dealings between Woodstock (or Eureka) and Hayes Lemmerz. During the preference period, the payment period did not increase. Hayes Lemmerz paid Woodstock on average within 63 days of the invoice being issued. Again, some invoices were paid earlier and some were paid later. Most importantly, there is absolutely no evidence to prove that Woodstock placed economic pressure on Hayes Lemmerz to pay its outstanding invoices. No late penalties were ever applied by Woodstock, no collection suits were instituted, and no interest was charged. In short, the practice of the parties continued in the same manner during the preference period as it had in the two years preceding the preference period.

Likewise, the fact that that the terms to which Woodstock and Hayes Lemmerz abided by were not "so idiosyncratic as to fall outside" the broad range of terms generally observed in the automotive industry cannot be disputed. As an initial matter, the consistent business relationship between Hayes Lemmerz and Woodstock is more relevant than the industry standard. Hayes Lemmerz and Woodstock had a well-established business relationship long before the preference period. Hayes Lemmerz has been purchasing automotive castings automotive castings for years (we have provided documentation since October 1999) and paying for these parts on average within 78 days of the invoice being issued. According to *Molded Acoustics* and *Color Tile*, the ordinary course between Woodstock and Hayes Lemmerz is more relevant in satisfying § 547(c)(2)(C), so long as their dealings do not greatly diverge from the industry standards.

Notwithstanding *Molded Acoustics*, Metal Technologies has now retained Conway MacKenzie & Dunleavy ("CM&D") as an expert witness to provide testimony as to the industry standard. CM&D will testify that the relevant industry is "Manufacturing – Gray and Ductile Iron Foundries" with the identification in industry sources as SIC #3321. CM&D will also testify that the middle 50% of companies surveyed within such industry received payments within a range of 43 to 62 days after invoices were issued and that such range representing only 50% of the companies is not sufficiently broad enough to reflect ordinary business terms within that industry. CM&D will further testify that an expansion of this range would be required to encompass a range of terms representative of the practices in which firms similar in some general way to Woodstock engage and that an expansion of the range represented by the upper and lower quartiles of the D&B Survey to include an average of 63 days would still be considered as falling within the broad range of terms representing ordinary business terms. Woodstock received payments from Hayes Lemmerz on average within 63 days of the invoice date during the preference period. Thus, Hayes Lemmerz's payments during the preference period to Woodstock were entirely consistent with the industry standard. For your convenience,



Mr. John Delnero
April 8, 2004
Page 7

attached as <u>Schedule 5</u> is an affidavit of Jeff Johnston at CM&D to support Woodstock's position.

<h2 style="text-align:center">VI. CONCLUSION</h2>

As described above, Woodstock has the following valid defenses:

| Defense | Amount |
|---|---|
| Total Alleged Preferences | $1,214,812 |
| Less Payments Prior to Preference Period | -   35,985 |
| Subtotal | $1,178,827 |
| Payments Not Received | -  158,812 |
| Subtotal | $1,020,015 |
| Less Pre-Payments | -  182,600 |
| Subtotal | $  837,415 |
| Less SNV | - 154,622 |
| Subtotal | $  682,793 |
| Less OCB | -  682,793 |
| Total Alleged Preferences | $0 |

As described above, Woodstock has valid defenses to all of the alleged preferences. However, in order to avoid the time and expense of further litigation, Woodstock offers $10,000 to settle this adversary proceeding.

We look forward to settlement of this adversary proceeding. If you have any questions, please do not hesitate to contact me.

Sincerely,

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

*Mary Kay Shaver*

Mary Kay Shaver

MKS:mlc
cc:    Mr. Jeffrey Turner
       Mr. Timothy Curtin
       Mr. Doug Reich
Enclosures
970171_2