**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---

|  | : |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Hayes Lemmerz International, Inc., *et al.*, | : | Case No. 01-11490  (MFW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---

|  | : |  |
|---|---|---|
| HLI Creditor Trust, | : |  |
|  | : |  |
| Plaintiff, | : | Adversary Proceeding No. |
|  | : |  |
| v. | : | A 03-58493  (PBL) |
|  | : |  |
| Metal Technologies Woodstock | : |  |
| Corporation f/k/a Metal Technologies | : |  |
| Woodstock, Ltd., | : |  |
|  | : |  |
| Defendant. | : | Related Documents: 121, 122 |
|  | : |  |

---

## AMENDED OPINION[1]

### I.  Introduction

On December 5, 2001, Hayes Lemmerz International, Inc. and certain affiliated entities

(hereinafter referred to as "Debtors") filed petitions under Chapter 11 of the Bankruptcy Code.

Pursuant to the Modified First Amended and Joint Plan of Reorganization of Hayes Lemmerz

International, Inc. and its Affiliated Debtors and Debtors-In-Possession, Dated April 9, 2003, As

---

[1]  Pursuant to the Order, Dated March 6, 2006, Granting the Motion of Defendant for Correction
of Clerical Mistake or to Alter or Amend the Judgment, this Opinion is amended to properly reflect the
correct defendant in this proceeding as stipulated by the parties in the Joint Pretrial Memorandum.

Further Modified, Debtors transferred to the HLI Creditor Trust (hereinafter referred to as "Plaintiff"), the right to bring this action under Chapter 5 of the Bankruptcy Code.

Plaintiff commenced this adversary proceeding on November 11, 2003, seeking to avoid and recover pursuant to §§ 547 and 550 of the Bankruptcy Code[2] certain allegedly preferential transfers made by Debtors to the defendant, Metal Technologies Woodstock Corporation f/k/a Metal Technologies Woodstock, Ltd. (hereinafter referred to as "Defendant"), during the 90 day period prior to the filing of Debtors' petitions (hereinafter referred to as "the preference period").

Trial in this adversary proceeding was held before the Court on December 7, 2005.  At the conclusion of the trial, the issues raised therein were taken under advisement and the Court is ready to render its decision.[3]

## II.  Jurisdiction and Venue

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157, and this is a core proceeding as that term is defined in 28 U.S.C. §§ 157(b)(2)(A), (E), (F), and (O).  Venue is proper under 28 U.S.C. § 1409.

## III. Discussion

Prior to trial, the parties filed the Joint Pretrial Memorandum as required by this Court's General Order Re: Pretrial Procedures in Adversary Proceedings Set for Trial, and both parties filed trial briefs as well.

At trial, the parties announced that they had stipulated to the requirements of §§ 547(b)

---

[2]  11 U.S.C. §§ 101 et seq.  References hereinafter to "the Code" or to statutory provisions by section number only, will be to provisions of the Bankruptcy Code unless the contrary is indicated.

[3]  This Opinion constitutes the findings of fact and conclusions of law of the Court required by Federal Rule of Bankruptcy Procedure 7052.

and 547(c)(2)(A).  Thus, the issues before the Court were whether, or to what extent, Defendant could satisfy the requirements of §§ 547(c)(2)(B) and (C),[4] the "ordinary course of business" defense, and 547(c)(4),[5] the "new value" defense.  Plaintiff also reserved its right to contest the amount of new value credit that Defendant could claim if some of the transfers were found to be unavoidable under the safe harbor of § 547(c)(2).  Finally, the parties agreed that the exhibits submitted to the Court were to be admitted into evidence without objection.  With these announcements, the case proceeded to trial.

Because the sole issue before the Court was one where the Defendant bore the burden of proof, Defendant was permitted to proceed first.  In its opening statement, Defendant conceded that during the period prior to Debtors' bankruptcy, there were oral and written contacts between the parties and that Defendant was aware of Debtors' deteriorating financial condition. Concerned about being paid, Defendant proposed that Debtors provide a letter of credit;

---

[4]  Section 547(b) sets out the five requirements which must be met in order for a transfer to be avoided by the trustee as a preference.  The ordinary course of business exception to the trustee's avoidance powers under § 547, as applicable to this proceeding, is as follows:
"(c) The trustee may not avoid under this section a transfer —
. . .
    (2) to the extent that such transfer was —
        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
        (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
        (C) made according to ordinary business terms."

This provision was amended effective October 17, 2005, however, that amendment is not applicable to this proceeding.

[5]  Section 547(c)(4) provides that the trustee may not avoid a transfer that was "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
    (A) not secured by an otherwise unavoidable security interest; and
    (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

however, nothing ever came of that proposal.  Defendant also insisted at one point that Debtors remain within the invoice credit terms for all then outstanding accounts and that new orders would be required to be paid in advance.

In response, Plaintiff contended that Defendant exerted extraordinary pressure on Debtors to obtain the preferential transfers.  Plaintiff alleged that Defendant was in a superior bargaining position due to the fact that it supplied a product vital to Debtors and that even a minor disruption in its supply would be extremely harmful if not fatal to Debtors' business.

### A. Testimony

Defendant first called Gregory Michael Riker, the Chief Financial Officer of Metal Technologies, Inc.  He testified that on June 5, 2001, Defendant acquired Eureka Foundry Corporation (hereinafter referred to as "Eureka") by a purchase of its assets and this new entity became known as Metal Technologies Woodstock, Ltd.  Debtors accounted for approximately 25% of Defendant's receivables, the remaining 75% being accounted for primarily by "TRW." Mr. Riker also stated that approximately 50% of Metal Technologies, Inc.'s business was automotive.

Mr. Riker testified that Defendant knew it had a problem with Debtors almost from the time the foundry unit was purchased, and that Defendant sent three letters to Debtor, dated September 15, 2001 (Trial Exhibit 16), October 24, 2001 (Trial Exhibit 17), and November 6, 2001 (Trial Exhibit 18).  He stated that Defendant's focus was to keep Debtor within the terms that had been agreed upon by the parties.

On cross-examination, Mr. Riker testified that Defendant had purchased the assets of Eureka, and not its stock.  He conceded that during the preference period, Defendant improved

4

its position with regard to the amount of its receivables from Debtor by some $450,000.00.  On redirect examination, he testified he was not aware of any change at any time in the payment terms between the parties from net 60 days to net 45 days.

Defendant next called Mr. Frank A. Staudinger, Corporate Controller of Metal Technologies, Inc.  Mr. Staudinger testified that the payment terms between Debtor and Defendant remained the same as they had been between Debtor and Eureka, namely net 60, prox. weekly.  He testified that invoices with net 60, prox. weekly terms were to be paid within 60 days, and that since payments were made on a weekly basis, the actual range that invoices were paid was between 56 and 70 days, with a three-day "mail float."  He also stated that customers in the automotive industry typically paid invoices in a range of 55-70 days.  He further testified that he was not aware of any change in credit terms between Debtor and Defendant at any time prior to requiring Debtors to pay cash-in-advance on new orders.

On cross-examination, Mr. Staudinger conceded that the November 6, 2001 letter put Debtor on a cash-in-advance basis for future orders and that shortly after the letter was sent, Defendant received a payment from Debtor of more than $200,000.00.

As its expert witness, Defendant called Mr. Jeffrey Leonard Johnston, a partner at Conway, MacKenzie & Dunleavy, a crisis and turnaround management and litigation support company, who deal frequently with the automotive industry.  Mr. Johnston is a Certified Public Accountant, a Certified Fraud Examiner, and Certified Turnaround Professional.

Mr. Johnston testified that he became familiar with the businesses of Defendant and Debtor, spoke with employees of both companies, and obtained industry information from Dun & Bradstreet and the Standard & Poors surveys and indices, in order to determine the industry

5

standards for collection of receivables of companies in the automotive parts supply industry. He referred to an excerpt from the 2001-2002 Dun & Bradstreet Industry Norms & Key Business Ratios including Standard Industrial Classification Code 3321 ("SIC 3321") companies in the gray and ductile iron foundry category (Trial Exhibit 31). He also referred to two Capital IQ Company (Standard & Poors) Screening Reports, one covering 203 Auto Component companies (Trial Exhibit 32) and the other covering 66 companies that manufacture engines, engine parts, brakes and wheel bearings, exhaust and emission controls, steering and suspension system components and textile motor vehicle trimmings (Trial Exhibit 33).

Mr. Johnston described, *inter alia*, his division of the payment data from the 52.4 day median into upper and lower quartiles, constituting the middle 50% of the 203 companies in the Capital IQ report, which ranged from 41.1 to 64.6 days from the invoice date. He also looked at different sub-groupings of the data which produced the middle 60% ranging from 39.0 to 67.6 days and the middle 75% from 30.4 to 79.0 days. As to the 66 companies in the narrower Exhibit 33 report, the middle 50%, 60% and 75% ranged between 45.4 and 67.6 days, 42.8 and 69.7 days and 40.6 and 84.5 days, respectively. During the preference period, payments to Defendant by Debtor averaged 63.8 days.

Mr. Johnston also testified that Debtor was a tier 1 supplier - one which supplied parts directly to original equipment manufacturers such as General Motors and Ford - while Defendant was a tier 2 supplier - one which supplied parts to the tier 1 suppliers, and that recent loss of market share had brought about pricing demands and financial pressures, culminating in a slowing of payments relative to terms within the industry.

In sum, Mr. Johnston's opinion was that the relevant industry in this case was the

6

automotive parts supply industry and that the payment terms and the payment history between

Defendant and Debtor were both consistent with practices within that industry and in the

ordinary course of business.  At the conclusion of Mr. Johnston's testimony, Defendant rested.

Plaintiff opened its case by moving for a directed verdict, which was denied.  Plaintiff

called as its first witness Mr. Kevin Duda, Director of Materials and Logistics for Debtor.  Mr.

Duda testified that he was responsible for review of payment terms and materials purchasing.

Mr. Duda believed that Defendant's request for a letter of credit was unusual at that time and no

other creditor of Debtor had made such a request.  Mr. Duda also stated that a meeting attended

by principals of both parties, was held on October 8, 2001, where Debtor's credit history, the

possibility of credit insurance, and Defendant's prospects for payment of its debts in the future

were discussed.  Following that meeting, other contacts, by telephone and correspondence, were

made by Defendant, including the letters dated October 24, 2001 and November 6, 2001.

Mr. Duda testified that he believed that the September 25, 2001 letter was an attempt by

Defendant to improve its position, because at that time Debtor owed Defendant between

$650,000.00 and $700,000.00, of which approximately $72,000.00 was past due.  Mr. Duda also

believed that it was in November 2001 that the credit terms between Debtor and Defendant were

changed, first to net 45 days, and then to cash-in-advance.  Mr. Duda stated that if Defendant had

demanded payment in full of the outstanding invoices, Debtor would have had no choice but to

pay them because Defendant was such a large supplier, and it supplied a part vital to Debtor's

business at that time.  Failure to pay would have caused Debtor to have been liable for

substantial penalties to General Motors if there was any interruption in shipments of that part.

On cross-examination, Mr. Duda admitted that he did not occupy a financial or

7

accounting position with Debtor.  He also conceded that he believed that net 60 days, prox. weekly were common credit terms for Debtor and this industry.

Mr. Steven David Sass, the Assistant Vice President, Legal Services, for Receivable Management Services Corporation (formerly Dun and Bradstreet), was called as Plaintiff's expert witness.  Mr. Sass testified to his opinion that ordinary course of business should be determined using the approximately 50 companies in the 2001 Dun and Bradstreet statistics for SIC 3321, Gray Ductile Iron Foundries, which reflected collection periods of ranging between 40 and 55 days, with a 48 day median.[6]  Mr. Sass gave his opinion that the first three transfers during the preference period were all outside the ordinary course of business, that the fourth through the seventh such transfers were outside, but that two invoices paid 65 days after invoice were "getting close" to being within the ordinary course of business; that the eighth transfer, with payments of invoices ranging from 65 to 50 days, included some within and some without the ordinary course of business; and that as to the three remaining transfers, those in the low 50's were but those in the high 50's were not in the ordinary course of business.[7]

Mr. Sass testified that he believed the SIC analysis was better than the data employed by Mr. Johnston.  He noted that Mr. Johnston's data included both tier 1 and tier 2 companies, including many which are quite large and publicly held, and that the SIC analysis is more representative of the parties' industry.  At the close of Mr. Sass' testimony, Plaintiff rested.

---

[6] This testimony, which is not supported by documentary evidence, appears to conflict somewhat with Trial Exhibit 31, which indicates a range between 42.7 and 61.7 days, with a 49.3 day median, for some 16 establishments in SIC 3321.  The apparent discrepancy was not raised by defendant in cross-examination or in argument.

[7] The transfers are listed in Trial Exhibit 1, consisting of a table showing the individual checks and the invoices paid by each, along with a separate tabulation of new value given during the preference period.

### B. Analysis

The original Complaint in this adversary proceeding sought to avoid and recover approximately $1 million, and upon the filing of an amended complaint, that amount had grown to more than $1.2 million.  Subsequently, Plaintiff has conceded that a total of $380,367.70 of the payments were not avoidable: a $38,958.60 payment was made more than 90 days prior to Debtors' filing of their petitions; a payment of $158,812.50 was not made at all; and seven payments totaling $182,596.60 were advance payments and therefore not for or on account of an antecedent debt.  (Trial Exhibit 2)  In addition, as detailed in Trial Exhibit 1,[8] Defendant provided $244,889.06 in new value under § 547(c)(4), which may reduce the amount which Plaintiff may recover.[9]  Thus, although the amount in question at trial was still significant, it was less than half the amount sought by Plaintiff in its original pleadings and Plaintiff makes no apology for what appears to have been far less than thorough exercise of due diligence prior to the institution of this action.

The specific issue before the Court, which arises in the context of § 547(c)(2), is whether a creditor can insist upon a debtor remaining within the credit terms established by the parties without taking the subsequent payments out of the ordinary course of business.  Prior to the amendment of the Bankruptcy Code which became effective October 17, 2005, the provisions of § 547(c)(2)(A), (B), and (C) were stated in the conjunctive, and thus each were required to be proven independently.  *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded*

---

[8]  Trial Exhibit 1 is attached hereto as Exhibit A.

[9]  An additional $40,974.64 of goods provided by Defendant does not qualify for the new value defense because the goods were provided prior to any preferential transfer against which the new value could be credited.

*Acoustical Products, Inc.)*, 18 F.3d 217, 223 (3d Cir.(Pa.), 1994); *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir.(N.J.), 1989).  In order to avoid recovery by Plaintiff, Defendant must prove[10] that the transfers were "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms."  11 U.S.C. § 547(c)(2).  This pre-amendment language is applicable to this proceeding, and as noted above, the parties have stipulated that the requirements of subsection (A) have been met and are not at issue.

### C.  Section 547(c)(2)(C)

In order to satisfy the requirement of § 547(c)(2)(C), Defendant must prove that the transfers in question were "made according to ordinary business terms."  This is frequently referred to as the "objective test," and this Court is guided by discussions regarding this issue in *Molded Acoustical* and *In re Tolona Pizza Products Corporation,* 3 F.3d 1029 (7th Cir.(Ill.), 1993).  As the *Molded Acoustical* Court explained:

> "'[O]rdinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C."

*Molded Acoustical*, 18 F.3d at 224 (quoting *In re Tolona Pizza Products Corporation,* 3 F.3d 1029, 1033) (emphasis in original).  The *Molded Acoustical* Court however, substituted the word "unusual" for "idiosyncratic" to remain more true to the legislative intent of Congress.  *Molded Acoustical*, 18 F.3d at 224.  In support of their respective positions on the industry standard, as

---

[10]  Pursuant to § 547(g), Defendant has the burden of proof as to each subsection under § 547(c).

well as the subsection (B) issue, Defendant offered the testimony of Mr. Johnston and Plaintiff

offered the testimony of Mr. Sass, both as experts.

Mr. Johnston relied upon a Dun and Bradstreet report outlining 2001 statistics for 16 SIC

3321 (Grey Ductile Iron Foundries) entities (Trial Exhibit 31), but more heavily upon the Capital

IQ Company Screening Reports on 203 Auto Component companies and on 66 more narrowly

defined companies more closely related to Defendant in the automotive parts supply industry

(Trial Exhibits 32 and 33).  He testified that the payment terms of net 60, prox. weekly were

consistent with industry practice within the automotive parts supply industry, which he opined

was the appropriate industry in this instance.

In contrast, Mr. Sass testified that in his opinion, ordinary course of business for this

"very narrow industry" was within a much more restricted range, namely 44 to 55 days, and that

any transfers paying invoices more than 65 days old could not be considered to have been in the

ordinary course.  He relied upon the SIC 3321 statistics,[11] and presumably discounted the Capital

IQ Company figures submitted by Mr. Johnston, which he had received only shortly before trial.

Mr. Sass' testimony was apparently intended to establish not only that most of the transfers in

question here, and virtually all that were made prior to November 8, 2001, could not be said to

have been made in the ordinary course of business under subsection (B), but also that the credit

terms between Debtor and Defendant were not in accordance with ordinary business terms under

subsection (C).

In this Court's opinion, Mr. Sass' approach to these issues, and his conclusions with

regard to them, are entirely too narrow and strict to comport with the approach taken in *Molded*

---

[11] *See,* Note 5.

*Acoustical* and *Tolona Pizza*.  Mr. Sass' approach would permit virtually no flexibility from the collection results of the statistical middle 50% of surveyed companies, without regard to any other factors, including but not limited to whether those companies were in fact comparable to Defendant.

Therefore, in light of the testimony and upon review of all the evidence presented with regard to this issue, the Court finds and holds, that the credit terms employed between the parties here, net 60, prox. weekly, under which all of the transfers were made, were consistent with "ordinary business terms" as that term is employed in § 547(c)(2)(C), and that Defendant has therefore met its burden of proof in that particular.[12]

### D.  Section 547(c)(2)(B)

The determination of whether or to what extent Defendant has proved that the transfers were made "in the ordinary course of business or financial affairs of the debtor and the transferee," as is required by subsection (B), often called the "subjective test," is more difficult. §547(c)(2)(B).  It involves a determination regarding the consistency of transactions between the debtor and creditor before and during the preference period.  *SEC v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.)*, 180 F.3d 504 (3rd Cir.(N.J.), 1999).  Various factors are considered in determining such consistency:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did

---

[12]  Although shipments after the November 6, 2001 letter required payment in advance, transfers in payment of invoices outstanding at that time continued to be subject to the previous terms.

> anything to gain an advantage (such as gain additional security) in
> light of the debtor's deteriorating financial condition.

*In re Allegheny Health, Education and Research Foundation*, 292 B.R. 68 (Bankr.W.D.Pa., 2003).

Plaintiff urges that this test cannot be met, because Defendant exerted undue pressure on Debtor to provide greater assurance of future payment, including requiring the provision of a $750,000.00 letter of credit, and to pay invoices more quickly.  It is also asserted that Defendant changed the credit terms between the parties to more restrictive or stringent ones.  Plaintiff relies upon several cases in its trial brief in support of its position.  *See*, *J. P. Fyfe, Inc.* 891 F.2d at 69; *Matter of Total Technical Services, Inc.*, 150 B.R. 893, 903-04 (Bankr.D.Del., 1993); *In re Pan Trading Corp., S.A.*, 125 B.R. 869 (Bankr.S.D.N.Y., 1991); *In re Seawinds Ltd.*, 91 B.R. 88, 91-92 (N.D.Cal., 1988).

Defendant responds that a creditor may not be prohibited from taking any action to protect itself from losses in dealing with a customer in financial difficulty, but that it simply must not take extreme actions.  Defendant relies for this position upon various authorities, including two cases decided by this Court.  *See*, *Hechinger Liquidation Trust v. Universal Forest Products (In re Hechinger Investment Co. of Delaware, Inc.)*, 326 B.R. 282 (Bankr.D.Del., 2005); *Hechinger Liquidation Trust v. James Austin Company (In re Hechinger Investment Co. of Delaware, Inc.)*, 320 B.R. 541 (Bankr.D.Del., 2004); *Big Wheel Holding Company, Inc. v. Federal Wholesale Co. (In re Big Wheel Holding Company, Inc.)*, 223 B.R. 669 (Bankr.D.Del., 1998); *Troisio v. E.B. Eddy Forest Products (In re Global Tissue L.L.C.)*, 106 Fed.Appx. 99 (3rd

Cir.(Del.), 2004).[13]

It is important to point out that there is no evidence whatever in the record to support the assertion of Mr. Duda that the payment terms between Defendant and Debtor were changed from net 60 days to net 45 days before they were changed to cash-in-advance.  Although Mr. Duda stated that Debtor was notified of changes in credit terms by letter, there is no reference in any correspondence in the record to any change in terms until the November 6, 2001 letter, which put Debtor on a cash-in-advance basis.  Further, Defendant's witnesses were asked whether any such change ever took place, and they stated that they knew of none.

Although there was some reference in the testimony about phone calls from Defendant, the three letters from Defendant (Trial Exhibits 16, 17, and 18) are clearly the primary if not the sole grounds for Plaintiff's contentions that Defendant employed extraordinary pressure tactics.

The September 25, 2001 letter, written just more than three months after Defendant had acquired Eureka, makes it clear that Defendant was not pleased with and wanted to review the existing credit terms, particularly because Defendant had been unable to obtain credit insurance on Debtor's receivables.  Although the September 25, 2001 letter mentions the desirability of a letter of credit and provides a copy of one, it makes no demand that the letter of credit be provided.  In this Court's opinion, the September 25, 2001 letter alone does not provide sufficient proof that any of the transfers in question here were made other than in the ordinary course of business between Debtor and Defendant.

The October 24, 2001 letter refers to an October 8, 2001 meeting and indicates that

---

[13]  The Court takes note that *Troisio* is of limited value as it simply affirmed the decisions of the Bankruptcy Court and the District Court as not being clearly erroneous.

14

Defendant is "unable to extend credit on the historical terms." (Trial Exhibit 17)  Reference to a letter of credit is less than demanding, but is more specific than previously, and Defendant indicates a willingness to share the cost of obtaining the letter and indicates that it should be provided by October 31, 2001.  As in the case of the September 25, 2001 letter, although Defendant notes its dissatisfaction with existing credit arrangements, no specific change to those terms is suggested, and no demand is made for any change in the timing or method of payment of outstanding invoices.  Again, it is this Court's view that the October 24, 2001 letter alone is not a  sufficient ground to find in Plaintiff's favor on this issue.

The transfers which are at issue here are outlined and tabulated in detail in Trial Exhibit 1.  After review of these transfers, certain observations may be made.  With the exception of the last of the eleven transfers, all were made by check, and all but the first and the last transfers paid more than one invoice.  The first seven transfers, dated September 14, 21 and 28, and October 8, 15, 22 and 29, were made at one-week intervals, and while the number of invoices paid by each varied somewhat, the age of those invoices was within the narrow range of 63 to 75 days, 36 of the 42 invoices paid being 65 to 72 days old.  Thus, it is evident that the September 25, 2001 and October 24, 2001 letters had very little, if indeed any, effect upon Debtor's payment practices.

Trial Exhibit 3 is a table of the 70 invoices paid during the preference period, with payment details and the aging of each invoice.  It shows an average age of 64 days, a median of 66 days, and a high and low of 75 and 50 days, respectfully.  It is noted that the 42 invoices paid by the first seven transfers had an average age of 68.9 days, a median of 69 days, and a high and low of 75 and 63 days.  The undisputed testimony was that under credit terms of net 60, prox.

weekly, payments would be "within terms" if received between 56 and 70 days after invoice date, allowing for a three-day "mail float."  It would be very difficult to support a finding that payments made either within terms or no more than five days outside terms would be other than in the ordinary course of business between Debtor and Defendant, particularly when such payments would be well within the range indicated by their credit history.

The November 6, 2001 letter (Trial Exhibit 18) is a different matter.  Defendant argues that placing Debtor on credit hold did not affect the outstanding invoices, since the letter only required that they be paid within terms.  The November 6, 2001 letter, however, literally changed everything about the credit relationship between the parties.  Although Defendant had been making apparently routine shipments to Debtor in response to purchase orders for the entire duration, after November 6, 2001 all subsequent shipments were required to be, and were paid for in advance, such payments being made by wire transfer rather than by check.

The November 6, 2001 letter refers to a current aging of Debtor's account which reflects $155,628.10 over the existing terms.  A review of the tabulation of the disputed payments in Trial Exhibit 1, however, reveals that invoices totaling $95,752.80, aged between 67 and 75 days, were paid by a check written October 29, 2001, and received on November 5, 2001 and that a check written November 7, 2001 and received November 8, 2001 paid five invoices, totaling $58,875.30, which ranged between 63 and 65 days in age.  Thus, all but $1,000.00 of the amount over existing terms had been largely paid by the time the November 6, 2001 letter was written, and was fully paid two days later.[14]  It appears that Mr. Riker, in the November 6, 2001

---

[14]  The $1,000 discrepancy appears to be simply an error, as it is not mentioned or accounted for elsewhere during or after the preference period.

16

letter, assumed that any invoice more than 60 days old was over existing terms even though the undisputed testimony was that those terms could result in payments of invoices up to 70 days old as being within terms.

The November 7, 2001 payment (Check No. 9897), while made on the same weekly schedule as those preceding it, appears, however, to have been influenced by the November 6, 2001 letter.  The amount was substantially larger than previous weekly payments.  It paid 17 invoices ranging from 50 to 65 days in age, with twelve of those invoices less than 60 days old. The remaining five invoices, 63 to 65 days old, as discussed above, may have been within terms as well.

The next two transfers, each in an amount less than $60,000 and paying five invoices, were made by checks written on November 14 and 21, thus maintaining the weekly payment regime.  The invoices paid by these transfers ranged between 54 and 56, and 52 and 56 days old, respectively.  The final payment in question was made by wire transfer on December 3, 2001, two days before the petition date.  It was in the amount of $35,683.20, of which $11,894.40 paid a single 55 day old invoice, the balance being an advance payment toward a future shipment. This payment was five days beyond the normal weekly payment schedule.

Generally, the invoices paid during the preference period were all for amounts between $11,606.76 and $12,076.02, the vast majority being in the amount of $11,975.04.  It is thus, apparent that Debtor's pattern of ordering product from Defendant, as well as its pattern of paying outstanding invoices on a weekly basis, remained consistent during the entire preference period.  Although the age of the invoices paid was shorter near the end of the period than in the beginning, the evidence does not support Plaintiff's contention that this was a result of

17

extraordinary pressure upon Debtor to pay its account more quickly.  The evidence indicates that as to outstanding invoices, Defendant simply urged Debtor to pay those invoices within the credit terms.  It appears, however, that after the receipt of the November 6, 2001 letter, Debtor began paying invoices which were substantially "younger" than had previously been the case, and that it continued to do so throughout the balance of the preference period.

It is rather interesting to note, that this pattern of more prompt payment is seen by Plaintiff as evidence of pressure by Defendant which precludes the payments from being found to have been in the ordinary course of business, while Plaintiff's expert, Mr. Sass would find only the payments made in less than 60 days to have been made in the ordinary course of business.

Section 547 was designed to encourage the equitable distribution of the debtor's assets to its creditors, to prevent voracious creditors from forcing the debtor during its slide into bankruptcy to make preferential payments to those creditors, and to prevent debtors in those circumstances from consciously preferring some creditors over others.  S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5874.  See also, *J. P. Fyfe,* 891 F.2d at 70; *In re Global Tissue L.L.C.*, 106 Fed.Appx. at 102; *Molded Acoustical*, 18 F.3d at 225.  The ordinary course of business exception was enacted so that creditors would be encouraged to continue to do business with debtors in those circumstances, rather than taking action which would simply hasten debtors' demise.  *In re Global Tissue L.L.C.*, 106 Fed.Appx. at 102; *Molded Acoustical*, 18 F.3d at 225.  The purpose of § 547 was not, however, to penalize a creditor which was simply trying to insulate itself from unnecessary losses, for instance, by insisting that the debtor honor the existing credit terms between the parties.

18

Defendant in this case, while announcing that it was not satisfied with the payment history which had existed between Debtor and Eureka, nevertheless, made no effort to change the terms as to outstanding invoices or to force Debtor to pay those invoices other than in accordance with their terms.  During the preference period, Defendant consistently made shipments based upon orders received until November 6, 2001, after which Debtor was required to make payments in advance and to bring overdue invoices current in order to obtain further shipments.  Debtors made payments on a weekly basis throughout the period, even after November 6, 2001, on previously issued invoices.  The fact that payments after November 6, 2001 were more prompt than had been the case previously was not due to pressure from Defendant, because no evidence of such pressure exists.

It is true that Defendant had suggested a letter of credit to protect itself, and that when it became apparent that Debtor would not or could not do so, Defendant put Debtor on a pay-in-advance basis for future orders.  At no time prior to November 6, 2001, however, did Defendant change its practice of routinely filling orders and issuing invoices to Debtor, and accepting payment by check.  Neither did Defendant dun Debtor for payment nor threaten Debtor with legal action to collect its receivables.  The fact that Defendant significantly reduced its receivables from Debtor during the preference period may be due in part to the fact that Debtor ordered and was shipped substantially less during that period than had been the case in prior periods.

### IV.  Conclusion

This Court has previously held that the fact that transfers are made within credit terms does not insure that such transfers were in the ordinary course of business.  See, *TWA, Inc. Post*

19

*Confirmation Estate v. World Aviation Supply, Inc. (In re TWA, Inc. Post Confirmation Estate)*, 327 B.R. 706 (Bankr.D.Del., 2005).  If a creditor had been traditionally late in making payment, and it suddenly makes payment within terms, such may be the antithesis of the ordinary course between the parties, and may compel the conclusion that the payment within terms is in fact an avoidable preference.

In this proceeding, of the 70 invoices paid during the preference period, as is noted above, the 42 paid prior to November 6, 2001 were, on average, 68.9 days old.  The 28 invoices paid on and after November 6, 2001 were, on average, 56.1 days old.  In the November 6, 2001 letter, Mr. Riker exhibited an apparent misunderstanding of the meaning and effect of "prox. weekly" and failed to include a "mail float" period in his calculations.  This may provide a partial explanation for Debtor thereafter making payment on invoices prior to the expiration of 60 days after their issuance.[15]

This sudden reversal of the practice of paying invoices either at the very end of their term or thereafter clearly resulted in Defendant being preferred over other similarly situated creditors, and such payments cannot be found to have been made in the ordinary course of business.

Based upon the foregoing, this Court is of the opinion, and therefore finds and concludes, that the first seven transfers,[16] as enumerated on Trial Exhibit 1, sought to be avoided and recovered by Plaintiff herein, were made in the ordinary course of business of the Debtor and Defendant, and that therefore none of such transfers may be avoided or recovered by Plaintiff

---

[15]  As is discussed above, the November 7, 2001 transfer paid five invoices between 63 and 65 days old.  Those invoices, however, were almost certainly included in the current aging referred to in the November 6, 2001 letter, and would have to have been paid before Defendant would make any further shipments, even if prepaid.

[16]  The first seven transfers were paid by Check Nos. 9334, 9379, 9470, 9588, 9640, 9682, 9774.

pursuant to § 547(b).  As to the eighth transfer, Check Number 9897, the Court finds and concludes that the first five invoices,[17] are within the safe harbor of § 547(c)(2) and are not subject to avoidance by Plaintiff.  The remaining 12 invoices, which were paid by Check Number 9897, are clearly outside the normal range established during the parties business relationship, and the Court finds and concludes that the portion of the eighth transfer paying those 12 invoices is not subject to the ordinary course of business exception and is avoidable as a preferential transfer by Plaintiff.  As to the last three transfers,[18] even though Debtor continued to make payments on a weekly basis thereafter, this Court cannot find that such transfers were made in the ordinary course of business, due to the apparent and substantial influence that the November 6, 2001 letter obviously had upon Debtor and its payment practices.

Since all of the provisions of new value advanced by Defendant took place on or before November 6, 2001, and since no transfers prior to that date have been found to be avoidable, it is unnecessary for the Court to consider whether the new value defense pursuant to § 547(c)(4) is applicable in this proceeding.

Judgment will be entered in favor of Defendant and against Plaintiff with regard to the first seven transfers and the first five invoices of the eighth transfer as listed on Trial Exhibit 1, which total $554,244.22, and Plaintiff shall take nothing with regard to such transfers.  Judgment will be entered in favor of Plaintiff and against Defendant with regard to the remaining transfers listed on Trial Exhibit 1, which total $272,844.53.

---

[17]  Those invoices include: Invoice No. 100008, dated 09/04/2001; Invoice No. 100007, dated 09/04/2001; Invoice No. 100016, dated 09/05/2001; Invoice No. 100017, dated 09/05/2001; and Invoice No. 100021, dated 09/06/2001.  Each invoice was in the amount of $11,975.06.

[18]  The last three transfers were paid by Check Nos. 9949 and 1003, and Wire Transfer No. 123602.

An appropriate Judgment follows.

Dated: March 6, 2006
         Wilmington, Delaware

BY THE COURT:

PAUL B. LINDSEY
UNITED STATES BANKRUPTCY JUDGE